# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

    vs.                               No. 21-CR-1578-DHU

CHRISTIAN QUINTANA,

     Defendant.

## DEFENDANT'S SENTENCING MEMORANDUM

I am submitting this short Memorandum on behalf of my client, Defendant Christian Quintana, in advance of his upcoming June 25 sentencing.  Assuming the Court accepts the Rule 11(c)(1)(C) plea agreement (which it should), it will sentence Christian somewhere within the 15-to-25-year range it provides for, *see* Plea Agreement ¶ 11.a, at 6 (Dkt. No. 40) (filed June 15, 2023), after first calculating a guideline sentencing range of 262-to-327 months, *see* Def's PSR Objections (Dkt. No. 57) (filed Feb. 21, 2024) (outlining two relatively conservative objections to the PSR, one of which is agreed to by the Government and the other of which was proposed by Probation itself).  The Court should sentence Christian to the low end of the (c)(1)(C) range and impose a sentence of 15 years' imprisonment — the equivalent of a just-over-3-offense-level downward variance.

## FACTUAL BACKGROUND

Christian has been a very difficult client to write a sentencing memorandum for, not for substantive reasons (he has only two prior convictions, one of which is a simple possession), nor because he has been difficult to deal with (Christian and I have a good relationship, and he's always polite, respectful, and grateful to me for my time), but because there has been a lack of normal

feedback from all quarters, including Christian himself.  Several community leaders in Dulce, New Mexico, where Christian was raised and where these crimes were committed, have raved positively about Christian over the phone and have continually told me that they would write letters on his behalf, but it has been difficult to obtain follow-through.  Harder still, Christian himself has been totally despondent about this case, talking to me a little bit but not really opening up, and declining to meet with a psych expert procured to conduct a sex-offender-specific evaluation of him — he would tell me that he would, but when the time came to actually sit down with the expert, he would be unable to bring himself to do it (this happened on two trips taken by the expert out to the Cibola jail, and a third trip in which Christian was transported to the courthouse for the evaluation).  While this was frustrating to deal with in real time, it is also telling: Christian is not uninterested in his case or conceptually unwilling to cooperate (he was not repeatedly baiting and switching on the psych evaluation to antagonize anyone); rather, having to face the horror of what he's done, what he's facing, and how the world sees him, is too much for him at the present time.

While this "psychological hurdle" is not ideal for purposes of putting on a sentencing-mitigation presentation, it is also temporary, and a not-unusual early-stage part of the long, slow process of rehabilitation — it is at least promising that Christian has been able to bring himself to admit his guilt here.  *United States v. Kearn*, 90 F.4th 1301, 1309 (2024) ("[I]t is common for defendants to maintain their innocence when charged with sensitive crimes, like child abuse cases.").  Christian will be incarcerated for *15 years*, virtually ensuring that he will be a different person on the other side of this sentence; in other words, the rehabilitative process of coming to grips with his crime, his addictions, and the places he allowed himself to sink to in his life, and then working to develop tools to address those issues, need not be fast to be ultimately effective. And, of course, upon completion of his prison sentence, Christian will be on supervision for five

years to life, thus ensuring that there is a backstop in place to protect the public against the possibility of recidivist tendencies.

I traveled up to Dulce last Sunday and spent the better part of the day with Christian's family, learning about his upbringing.  Christian grew up in a small but well-kept house with his mother and six half-siblings.  His mother, Sadonya Quintana, and the three sisters who still in Dulce met with me as a group, and I was struck by how supportive, loving, and normal the family was.



*Christian's mom and two of his younger sisters, Jennifer (age 16) and Trisha (age 17).  Not pictured here is sister Talia (age 22), who had to leave before I took the picture.*

Christian was born in 1995 to Sadonya and a man from Oklahoma who is not the father of any of her other children.  Christian would visit his biological father once a year or so, and tried to

form a meaningful relationship with him, but his father was uninterested in doing so. Christian's actual father figure was a man named Orlando Gutierrez, who Sadonya married when Christian was 8 years old.

The town of Dulce — an isolated and breathtakingly scenic mountain town of ~2,700 people located a few miles south of the Colorado border in Rio Arriba County — is virtually synonymous with the Jicarilla Apache Nation. The Nation is fully sovereign and maintains a number of enormous, beautiful civic buildings in town. It has comparatively stringent blood-quantum requirements for enrollment, which carries with it valuable entitlements to both direct (dividends) and indirect (*e.g.*, reserved employment) financial benefits, imparting what Sadonya views as effectively second-class citizenship on non-members. Sadonya herself is enrolled, but none of her children are — Christian is only under this Court's jurisdiction by way of a grandfather clause.

Despite their non-enrollment, the Quintanas, including Christian, are unmistakably Jicarilla Apache. Christian in particular was especially invested in his cultural identity growing up, keeping active in the tribal community and showing special enthusiasm for its rituals and celebrations. The Quintanas are members of the Llaneros clan, one of the two Jicarilla Apache clans (the other being the Olleros), and growing up Christian would spend days helping the clan set up for the annual Go-Jii-Ya harvest, which culminates in the two clans competing in a relay footrace in which Christian would regularly and proudly run:



*Christian (right) preparing to run for the Llaneros clan in the Go-Jii-Ya harvest celebration footrace.  This photograph hangs prominently above the dinner table in the Quintanas' home.*

Christian's sisters needed no prodding to effuse at length about him.  They described him as a kind, protective older brother who loved the outdoors and who would design imaginative games to play in the woods around Dulce.  In season, they would spend their days together looking for shed deer antlers, which are valuable in Jicarilla Apache culture and could be sold to local dealers.  Christian dreamed of becoming a forestry firefighter into his teens and built an impressive wood-frame watchtower by himself to keep a lookout for fires.  The Quintanas went to church and

Sunday school every week at a small but well-maintained church just a few minutes' walk down the road from their home.

I believe Christian's problems largely stem from a few discrete, traumatic events in his upbringing.  Christian's childhood best friends were a young man named Angel Valdez, and Christian's cousin, Daniel Gonzales; Christian's two older sisters, especially, described the three similarly-aged boys as inseparable.  When Christian was 13, Angel was taken from his family due to the parents' alcoholism and placed at a dormitory maintained by the Nation for such cases. Angel took the move hard, and he killed himself shortly after.  Christian did not talk or eat for days afterward, and his mom and all three sisters say that he was never the same again.  Daniel ended up getting involved with methamphetamine — first as a user, and later as a dealer — which was how Christian began to use.  In 2019, Daniel and his girlfriend were tortured and murdered in their home, apparently by others in the drug trade, under circumstances that Sadonya could not describe without crying.

In the period between these two events, as Christian was beginning high school, he met and began 'dating' a much-older woman (Sadonya believes she is only a few years younger than her) named Deedra Martinez, who has 9 kids, including the two victims in this case.  Sadonya knew that Christian was dating someone because he would come home with hickeys all over himself, but Christian assiduously refused to tell her who it was until he turned 18.  When Sadonya finally learned of the identity of Christian's girlfriend, she was deeply unhappy about the age gap, but the family also described the relationship as unhealthy in other ways.  They described Deedra as "obsessed" with Christian, relating to me that she has 3 tattoos of him, and on a couple of occasions chose to live apart from her children rather than be away from Christian.  From essentially the start of the relationship, Christian was thrust into the role of father for Deedra's 9

children (who resented Christian, and some of whom were not much younger than him), and, according to Christian's family, she would use the sizable *per diem* dividends paid to her (~$600 per child) to control and entice Christian into staying. Christian's family repeatedly referred to the relationship as "grooming."

Although Deedra herself was smitten with Christian, her family did not have a good relationship with him. Apparently Christian's relationship with Deedra began with Deedra essentially poaching him from her sister, Vanessa, whom Christian dated first, creating permanent acrimony. In the midst of this, another of Deedra's sisters, Bonnie, induced her boyfriend, a man named Mitchell Martinez, to attack Christian in his home; Christian responded by stabbing Mitchell, resulting in Christian's first (and only serious) adult conviction, for assault. *See* PSR ¶ 57, at 11. Even *the Government* was openly unconvinced of Christian's guilt in that case, hanging its hat largely on the (somewhat jury-unpalatable) principle that "self-defense cannot be invoked when the assault involved mutual combat":

> Based on some of the information, it could be possible that the Defendant would get instructions on self-defense if the matter proceeded to trial. The United States would argue that the two individuals agreed to mutual combat, which is why John Doe arrived at the residence in the first place. The Defendant would likely contend that he didn't pursue the victim, but rather stood his ground at his girlfriend's home. . . . Taking those things into consideration the parties negotiated a plea that reconciled what would have otherwise been an indeterminate trial dynamic.

United States Sentencing Memorandum at 2, *United States v. Quintana*, No. 15-CR-0432-WJ (Dkt. No. 30) (D.N.M. Mar. 24, 2016). Chief Judge Johnson cut the Government's request for a 24-month sentence down to 18 months. *See id.* at 3; PSR ¶ 57, at 11.

When Christian was released from prison in 2017, he struggled to stay fully clean, but truth be told his effort was not terrible: he had one supervised-release violation ("SRV") a little over a year into his term for a positive marijuana test, which the Court held in abeyance and then

dismissed after 6 months without a violation; and then, a little over two years after that violation, he had a second SRV for testing positive for marijuana and amphetamines, for which the Court sentenced him to 9 months' custody with no follow-on term of supervised release. *See* PSR ¶ 57, at 11-12; Docket Sheet, *United States v. Quintana*, No. 15-CR-0432-WJ (docket entries dated Apr. 24, 2018 & July 20, 2020). Even during this period, Christian's sisters describe him as a loving, doting, and engaged brother and uncle.



*Christian with his nephews*

The two crimes of conviction here occurred widely apart from each other in time. The first offense chronologically (Count 1, involving the then-seven-year-old girl), occurred in 2012/2013, when Christian himself was 17/18 years old. The second crime (involving the then-17-year-old girl) took place in 2015/2016, when Christian was 19/20 years old. There is evidence — although it not considered relevant conduct to this sentencing — that there were other instances of sexual conduct with these two girls in the period in between the two charged offenses. *See* PSR ¶¶ 51-55, at 10-11.

I frankly do not know why Christian committed these crimes, but it is noteworthy that they began during the very period in which Christian himself was a child in a secretive and exploitative

sexual relationship with an adult. Christian had also had sexual relations with Deedra's sister prior to Deedra (with that behavior essentially rewarded by Deedra), and it seems likely that these formative experiences contributed to instilling a wholly disordered conception of what a healthy, consensual sexual relationship should look like.

## ARGUMENT

None of the above is intended to downplay the impact that these crimes have likely had on the two victims. Christian will be spending at least *over half of his life* to date in a federal prison, branded a child-sex offender, because of it. He will be watched like a hawk for years if not decades upon his release, and he will be marked with society's greatest stigma for the rest of his life. This all will happen even if the Court sentences him to the low-end of the (c)(1)(C) range.

The question before the Court is whether such a sentence is sufficient to carry out the sentencing goals of § 3553(a), or whether the Court is so confident in Christian's irredeemability that it feels it must incapacitate him for longer than 15 years. To be clear, it has been repeatedly empirically demonstrated that the *only* salutary outcome from increased imprisonment — "outcome" here referring to objective, tangible effects like deterrence and rehabilitation, versus, say, fundamentally normative/subjective values, like the societal vindication of respect for the law or just deserts — is the incapacitative effect of keeping a defendant from committing new crimes against the public for the duration of the imprisonment itself; incarceration actually has an adverse impact on recidivism rates. *See*, *e.g.*, *United States v. Courtney*, 76 F. Supp. 1267, 1304 n.13 (D.N.M. 2014) (Browning, J.) ("The weight of the research indicates that incarceration — imposing it at all or increasing the amount imposed — either has no significant correlation to recidivism or *increases* the defendant's likelihood to recidivate." (emphasis in original) (collecting studies)); Prof. Michael Mueller-Smith (Univ. of Mich., Econ. Dep't), *The Criminal and Labor*

*Market Impacts of Incarceration*, at 27, https://sites.lsa.umich.edu/mgms/wp-content/uploads/ sites/283/2015/09/incar.pdf (2015) ("I find that longer exposure to jail and prison increases the likelihood of new criminal behavior with the largest effects observed for drug possession and property crimes. . . .  In addition, I also observe a small but significant increase in the likelihood of violent offenses post-release.").  And while the *offense* of adult-on-child sexual contact evokes rightful outrage from the public, the evidence also suggests that sex offenders, particularly those like Christian, are uniquely well-suited to rehabilitation and the avoidance of future recidivism. *See*, *e.g.*, R. Karl Hanson, *Age & Sexual Recidivism: A Comparison of Rapists & Child Molesters*, Canadian Dep't of Solicitor General at 2 (2001), https://www.publicsafety.gc.ca/cnt/rsrcs/pblctns/ sxl-rcdvsm-cmprsn/sxl-rcdvsm-cmprsn-eng.pdf (last visited June 12, 2024) ("Child molesters who only target intrafamilial victims (incest offenders) have consistently lower recidivism risk than other sexual offenders."); Roger Przybylski, *Recidivism of Adult Sexual Offenders*, U.S. Dep't of Justice Office of Justice Programs, Sex Offender Mgmt. Assessment & Planning Initiative, at 5 (July 2015), https://smart.ojp.gov/sites/g/files/xyckuh231/files/media/document/recidivismof adultsexualoffenders.pdf (last visited June 13, 2024) ("Research that examines the recidivism of rapists and child molesters indicates that the highest observed recidivism rates are found among child molesters who offend against boys. Comparatively lower recidivism rates are found for rapists, child molesters who victimize girls, and incest offenders."  ).

"'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Pepper v. United States*, 562 U.S. 476, 487 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).  "Underlying this tradition is the principle that 'the punishment should fit the offender

and not merely the crime.'" *Pepper*, 562 U.S. at 487-88 (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).

Here, a 15-year sentence fits Christian better than any other in the 15-to-25-year range. Christian will be almost exactly 40 years old upon his release from such a sentence (85% of 180 months is 153 months, and he has served roughly 27 months in pretrial custody to date, making for a projected release date 10.5 years from now), putting him in a better place on the following graph of recidivism rates by age at time of release:



Hanson, *supra* at 10.[1]  As the Court can see, whether Christian's case is treated as one of rape or intrafamilial molestation, relatively little recidivism-rate reduction is gained from a release date of ~50 years old versus 40.

---

[1] Frustratingly (and surprisingly, given its prevalence), in this study and many others, it is either not made clear whether stepfather-stepchild abuse is considered intrafamilial/incest, or it is acknowledged that the underlying data sources consulted fail to reliably sort such cases into one category or the other.  Common sense suggests that stepfather abuse is highly dissimilar to true extrafamilial abuse — stepfathers have regular contact, including unsupervised one-on-one time, time during off hours, and close proximity during (*e.g.*) bathing and sleeping activities, and have preexisting interpersonal bonds with their victims, in ways that resemble biological-parent abuse — and so I would argue that incest statistics are probably more apt here.

The Court should consider Christian's young age, and what he was going through, at the time he committed these offenses. It should further consider that Christian *will be* a different person when he is released, whether that is in 15 years or 25 — and he may well be a worse one if released in 25 than he would be if released in 15. But mostly, the Court should give the new Christian a *chance* to live his 40s as a free man. He will remain under the watchful eye of this Court for many years to come thereafter, which will provide adequate protection to the public. No sentence will ever absolutely guarantee that a defendant does not recidivate, nor quell all of the unease the Court may have about that defendant. But the Court must balance that unease against the highly destructive effect of taking away an additional decade of a person's life, and the remainder of any semblance of youth. Here, that balancing counsels in favor of a 15-year sentence.

## CONCLUSION

The Court should accept the Rule 11(c)(1)(C) Plea Agreement and sentence Christian to 15 years' imprisonment.

Respectfully submitted,

HARRISON & HART, LLC

By: _____

    Carter B. Harrison IV
924 Park Avenue SW, Suite E
Albuquerque, NM 87102
Tel:  (505) 295-3261
Fax:  (505) 341-9340
Email:  carter@harrisonhartlaw.com

*Attorneys for the Defendant*

**This Memorandum Has No Exhibits**

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of June 2024, I filed the foregoing Memorandum electronically via the Court's CM/ECF filing system, causing a copy of it to be served on all counsel of record.

HARRISON & HART, LLC

By:  _/s/  Carter B. Harrison IV_____
          Carter B. Harrison IV